UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES MORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV 189 LMB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of James Morris for Disability Insurance Benefits under Title II of the Social Security Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 17).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 22).  Plaintiff has filed a Reply.  (Doc. No. 26).

## Procedural History

On July 14, 2009, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on February 28, 2008.  (Tr. 112-18).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated February 16, 2011.  (Tr. 66-70, 17-24).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

- 1 -

Social Security Administration (SSA), which was denied on December 20, 2011. (Tr. 11-13, 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on September 1, 2010. (Tr. 27). Plaintiff was present and was represented by counsel. (<u>Id.</u>). Also present was vocational expert James Israel. (<u>Id.</u>).

The ALJ examined plaintiff, who testified that he was forty-eight years of age. (Tr. 29). Plaintiff stated that he was six-feet three-inches tall, and weighed 250 pounds. (Tr. 30). Plaintiff testified that he lives alone in a condominium. (<u>Id.</u>). Plaintiff stated that he was single and had no children. (<u>Id.</u>).

Plaintiff testified that he did not drive a vehicle because he had been directed by his doctor not to drive due to seizures. (Tr. 31).

Plaintiff stated that he had completed two years of college and received an associate's degree. (<u>Id.</u>). Plaintiff testified that he majored in criminology. (<u>Id.</u>).

Plaintiff's attorney examined plaintiff, who testified that he has seizures four times a week. (Tr. 32). Plaintiff stated that his seizures usually occur during the night, but they sometimes occur during the day. (Tr. 33). Plaintiff testified that, out of the four seizures he experiences in a typical week, one occurs during the day. (<u>Id.</u>).

Plaintiff stated that he knows he has had a seizure at night because his "brain gets fuzzy," he is very tired, and he almost urinates in his bed. (<u>Id.</u>). Plaintiff testified that he has urinated in

his bed, and that this last occurred two months prior to the hearing.  (Id.).  Plaintiff stated that his

nighttime seizures last about three minutes.  (Id.).  Plaintiff testified that his body shakes when he

has a seizure.  (Id.).

　　　Plaintiff stated that, after experiencing a seizure, he is tired and he sleeps longer than

usual.  (Tr. 34).  Plaintiff testified that he usually sleeps about ten hours after experiencing a

nighttime seizure.  (Id.).  Plaintiff stated that he still feels tired when he wakes, and that he takes

naps during the day.  (Id.).  Plaintiff testified that it is difficult to focus, and difficult to perform

activities around the house after experiencing a seizure.  (Id.).

　　　Plaintiff stated that, when he experiences a seizure during the day, his "brain is foggy," he

is unable to see well, and he is unable to stand.  (Tr. 35).  Plaintiff testified that he has to lie down

when the seizure begins so he does not fall down.  (Id.).  Plaintiff stated that he has fallen down

during a seizure, and that this last occurred about two weeks prior to the hearing.  (Id.).  Plaintiff

testified that he does not know how long his daytime seizures last because he usually passes out.

(Id.).  Plaintiff stated that, after he wakes up, he takes a nap for two hours or longer because the

seizures tire him.  (Id.).  Plaintiff testified that he has difficulty concentrating after having a

daytime seizure.  (Id.).

　　　Plaintiff testified that he underwent brain surgery as a result of the seizures in

approximately 2000.  (Tr. 36).  Plaintiff stated that he sees Dr. Gary Myers for his seizures, and

that he has been seeing him his whole life.  (Id.).  Plaintiff testified that Dr. Myers knows him

well.  (Id.).

　　　Plaintiff stated that he takes four different medications, and that he takes them as

prescribed.  (Id.).  Plaintiff testified that his seizures are occurring despite the fact that he is taking

- 3 -

his medication.  (Id.).  Plaintiff stated that, as a result of the medications he takes, he is tired and unable to concentrate.  (Id.).  Plaintiff testified that he takes multiple naps a day, even when he does not have seizures.  (Tr. 37).

Plaintiff stated that he has difficulty with his memory.  (Id.).  Plaintiff testified that he has problems remembering things such as where he put his car keys, as well as details from his childhood.  (Id.).

Plaintiff stated that his sister, who was present at the hearing, assists him with everything. (Tr. 38).  Plaintiff testified that his sister reminds him of appointments, helped him complete his disability application, helps him with his medications, helps him pay bills, goes grocery shopping with him, and drives him anywhere he needs to go.  (Id.).  Plaintiff stated that he sees his sister two to three times a week.  (Id.).

Plaintiff testified that he has had seizures his whole life.  (Tr. 39).  Plaintiff stated that he was able to work for a period with his seizures, but they have gotten worse.  (Id.).  Plaintiff testified that his doctor keeps increasing his medications.  (Id.).  Plaintiff stated that his seizures are sometimes triggered when he is excited, but they also occur when he is not excited.  (Id.).

Plaintiff testified that he typically wakes up at 7:00 a.m., and watches television.  (Id.). Plaintiff stated that he has difficulty concentrating on television programs.  (Tr. 40).  Plaintiff testified that he leaves the house once or twice a week.  (Id.).  Plaintiff stated that he occasionally goes out to eat with his sister.  (Id.).  Plaintiff testified that he never goes out without his sister. (Id.).  Plaintiff stated that he does not cook other than heating food in the microwave.  (Id.). Plaintiff testified that he enjoys reading, but he rarely reads because he is unable to concentrate long enough to read a book.  (Tr. 41).  Plaintiff stated that he is able to clean his house, although

- 4 -

he only does this about once a week.  (Id.).

The ALJ re-examined plaintiff, who testified that he spends most of his time watching television.  (Id.).

Plaintiff stated that his nighttime seizures wake him up.  (Id.).  Plaintiff testified that, when he experiences a nighttime seizure, he slowly walks to the bathroom to urinate so he does not urinate in his bed.  (Tr. 42).  Plaintiff stated that he feels "something going on in" his head, which he described as a tingling sensation.  (Id.).  Plaintiff testified that he urinates, and then gets back into bed and tries to go back to sleep.  (Tr. 43).  Plaintiff stated that when he wakes up the next morning, he feels tired, groggy, and slow.  (Id.).  Plaintiff testified that he feels these symptoms for approximately two hours after waking in the morning.  (Id.).  Plaintiff stated that, after this two-hour period, he begins to have more energy.  (Tr. 44).

Plaintiff testified that he occasionally blacks out completely when he experiences a seizure during the day.  (Id.).  Plaintiff stated that he has fallen down and hit his head due to a blackout. (Id.).  Plaintiff testified that, when he wakes after a blackout, he feels overwhelmingly tired and has to go to sleep.  (Id.).  Plaintiff stated that, when he was working at the hospital, he would have to miss at least two hours of work when he experienced a seizure on the job.  (Id.).  Plaintiff testified that he experiences at least one of these daytime seizures a week.  (Tr. 45).

Plaintiff stated that his seizures have increased over the past year.  (Id.).  Plaintiff testified that his doctor does not know why his seizures have increased in frequency and severity.  (Id.).

Plaintiff stated that he did not think he could return to his past job at the hospital, and that he did not believe this employer would accommodate him by allowing him to take a break after he experiences a seizure.  (Tr. 46).  Plaintiff testified that he was terminated from this position due to

his job performance.  (Id.).  Plaintiff stated that he had worked at this position for twenty years when he was terminated, and that his termination came as a surprise to him.  (Id.).  Plaintiff testified that he does not receive a pension from this position, or any other kind of retirement funds.  (Id.).

Plaintiff stated that he became disabled on February 28, 2008, the date on which he was terminated.  (Tr. 48).  Plaintiff testified that he does not believe he could have worked at any other position after this time.  (Id.).

When asked whether he could have continued performing his work at the hospital if he had not been terminated, plaintiff stated "I'm not sure.  I don't know."  (Id.).  Plaintiff testified that he was experiencing blackouts at work about once a week at the time he was terminated. (Id.).  Plaintiff stated that his employer had been accommodating about his blackouts, and had given him a place to rest for a couple hours after experiencing a seizure.  (Tr. 49).  Plaintiff testified that his employer had been accommodating him in this way for at least one year prior to his termination.  (Id.).

Plaintiff stated that his work performance declined due to the memory problems he was experiencing.  (Id.).  Plaintiff testified that he forgot how to do things that he had been doing for a long time, and it therefore took him longer to perform his work.  (Id.).

Plaintiff stated that he underwent surgery in 2000, at which time he had part of his brain removed.  (Tr. 50).  Plaintiff stated that the purpose of the surgery was to decrease grand mal seizures.  (Id.).  Plaintiff testified that his seizures are worse now than they were prior to the surgery.  (Id.).  Plaintiff stated that his seizures decreased somewhat immediately following the surgery but began to worsen again.  (Tr. 51).

- 6 -

Plaintiff testified that he has not looked for work at all since he was terminated in February 2008.  (Id.).

The ALJ next examined vocational expert James Israel.  The ALJ asked Mr. Israel whether plaintiff would be able to engage in any form of work activity if he were found credible in that he experienced four seizures a week, one occurring during the day, after which he would lose two hours at work.  (Tr. 52).  Mr. Israel testified that "without equivocation," plaintiff would be able to perform no form of work activity.  (Id.).  Mr. Israel stated that employers would not tolerate this limitation.  (Id.).

Mr. Israel testified in response to a second hypothetical that an employer would not tolerate an employee experiencing one seizure a month that involved losing two hours of work.  (Id.).  Mr. Israel stated that an employer would have to be assured that the employee's seizures were under control in order to maintain employment after having one seizure on the job.  (Tr. 53).  Mr. Israel testified that an employee would probably be terminated if he experienced two seizures on the job in one year.  (Tr. 53-54).

Mr. Israel stated that the employer's tolerance for seizures would depend on the nature of the job and the nature of the seizures.  (Tr. 55).  For example, Mr. Israel stated that there would be no tolerance if the position involved moving machinery, sharp objects, or heights.  (Id.).  Mr. Israel testified that minor seizures in an office environment may be tolerated to an extent.  (Id.).  Mr. Israel stated that seizures generally would be intolerable to employers.  (Tr. 56).

**B.**   **Relevant Medical Records**

Plaintiff presented to Gary H. Myers, M.D. at Metropolitan Neurology, Ltd. on February 27, 2007, for neurological re-evaluation.  (Tr. 266).  Dr. Myers indicated that plaintiff had

experienced two seizures over the past nine-week period. (Id.). Dr. Myers stated that plaintiff appeared to be doing better since his medications were adjusted, although he was still having seizures. (Id.). Dr. Myers started plaintiff on Zonegran,[1] and continued him on Topamax,[2] Lamictal,[3] and Tegretol.[4] (Id.). Dr. Myers indicated that plaintiff was on the maximum dosage of the latter three drugs, although the Zonegran could be increased if needed. (Id.). Dr. Myers noted that plaintiff could return in four months if he was doing well. (Id.).

Plaintiff saw Dr. Myers on July 2, 2007, at which time Dr. Myers stated that plaintiff was on numerous medications for his seizure disorder and was still having seizures. (Tr. 267). Dr. Myers noted that the seizures seem to recur about once monthly. (Id.). Dr. Myers increased plaintiff's dosage of Zonegran. (Id.).

On October 30, 2007, Dr. Myers stated that plaintiff was doing better, having had only two seizures in the past four months. (Tr. 268). Dr. Myers indicated that he would like to increase plaintiff's dosage of Zonegran, but plaintiff did not want to take a higher dose because he believed he was on too much medication. (Id.). Dr. Myers decreased plaintiff's dosage of Topamax due to plaintiff's complaints of headaches. (Id.).

------------------------------------------------------

[1]Zonegran is indicated for the treatment of partial seizures in adults with epilepsy. See Physician's Desk Reference (PDR), 1090 (63rd Ed. 2009).

[2]Topamax is indicated for the treatment of seizures. See WebMD, http://www.webmd.com/drugs (last visited March 19, 2013).

[3]Lamictal is indicated for the treatment of partial seizures, and primary generalized tonic-clonic seizures. See PDR at 1490-91.

[4]Tegretol is indicated for the treatment of seizures. See WebMD, http://www.webmd.com/drugs (last visited March 19, 2013).

Plaintiff was admitted at St. Anthony's Medical Center on April 5, 2008, due to mental status changes.  (Tr. 224-25).  It was noted that plaintiff had recently lost his job and his insurance, and as a result he had not gotten his medications refilled.  (Tr. 224).  Plaintiff's family contacted Dr. Myers, who restarted plaintiff's medications.  (Id.).  Plaintiff's sister subsequently reported to Dr. Myers that plaintiff was not acting right.  (Id.).  Dr. Myers thought that plaintiff's behavior was due to his medications being stopped and restarted.  (Id.).  The next day, plaintiff's sister brought him to the emergency room after plaintiff was unable to walk and was somewhat incontinent.  (Id.).  Plaintiff underwent a CT scan of the brain, which revealed a prior craniotomy[5] on the right with either severe leukomalacia[6] or surgical removal of part of the temporal lobe, but no acute findings.  (Id.).  Plaintiff saw Richard Muchnick, M.D. on April 6, 2008, at which time plaintiff was not very communicative.  (Id.).  Plaintiff also saw neurologist Michelle A. Wood, D.O. on April 6, 2008, at which time it was noted that plaintiff said some bizarre things, his reactions were very delayed, and he had some eye avoidance.  (Tr. 226).  Dr. Wood diagnosed plaintiff with acute mental status change.  (Tr. 227).  Dr. Wood noted that Topamax can cause some cognitive side effects, and recommended discontinuing the Topamax.  (Id.).  Dr. Wood also recommended a psychiatric consult.  (Id.).  On April 7, 2008, Dr. Muchnick noted that plaintiff had experienced some insomnia and significant mood swings and range which were possibly related to being terminated from his job.  (Id.).  Upon neurologic examination, plaintiff's motor, sensory, coordination, and cranial nerve examination were normal.  (Id.).  Upon mental status examination, plaintiff had some difficulty communicating.  (Id.).  Plaintiff was answering in one-

_____

[5]Opening into the skull.  Stedman's Medical Dictionary, 455 (28th Ed. 2006).

[6]Disorder involving softening of brain white matter.  Stedman's at 1076.

syllable answers and did not seem to be as alert as he normally was.  (Id.).  Dr. Muchnick

diagnosed plaintiff with mental status changes due to possible medication effect or psychiatric

effect; history of brain surgery, 1998; and history of depression.  (Tr. 225).  Plaintiff underwent a

psychiatry consult and was diagnosed with depression, NOS; and mental disorder NOS related to

plaintiff's seizure disorder.  (Tr. 229).  Plaintiff was prescribed Celexa.[7]  (Id.).  Plaintiff underwent

an EEG on April 7, 2008, which was abnormal due to right-sided slowing as well as sharp waves

and spike activity.  (Tr. 240).  Plaintiff's EEG was consistent with a right-cerebral lesion with a

seizure-type of focus.  (Id.).  Plaintiff was discharged on April 7, 2008, after seeing Dr. Myers.

(Tr. 225).  Dr. Myers indicated that plaintiff would require some close follow-up and that

plaintiff's family would need to watch him and make sure he took his medication.  (Id.).

 Plaintiff presented to Dr. Myers on May 1, 2008, at which time Dr. Myers indicated that

plaintiff was "back to baseline."  (Tr. 270).  Dr. Myers stated that plaintiff was taking his

medications, and was having seizures during his sleep very infrequently.  (Id.).  Dr. Myers stated

that plaintiff's EEG reveals that, due to the trauma and surgery, plaintiff "certainly has a seizure

focus that is causing his problems."  (Id.).  Dr. Myers stated that, if plaintiff remains stable, he

need not return for six to eight months.  (Id.).

 On October 28, 2008, Dr. Myers indicated that plaintiff had insurance and that he was

"doing fairly well."  (Tr. 271).  Plaintiff reported experiencing less than one seizure every two

months, and that his seizures usually occur during his sleep.  (Id.).  Dr. Myers stated that this was

a "remarkable improvement," and that plaintiff seemed satisfied with his current treatment.  (Id.).

---

[7]Celexa is indicated for the treatment of depression.  See PDR at 1161.

Dr. Myers stated that, because plaintiff was doing well, he could reduce the frequency of his office visits to nine months.  (Id.).

On July 17, 2009, Dr. Myers stated that plaintiff has a "very difficult seizure disorder for which he is on numerous medications."  (Tr. 272).  Dr. Myers noted that plaintiff had been experiencing seizures since the age of five, and that his seizures were "so bad" that he underwent seizure surgery of the brain around 2000.  (Id.).  Plaintiff was taking Zonegran, Lamictal, Topamax, and Tegretol.  (Id.).  Dr. Myers stated that, despite all of plaintiff's medications, he was still having at least one seizure monthly.  (Id.).  Dr. Myers indicated that plaintiff's seizures usually occur during his sleep.  (Id.).  Dr. Myers stated that plaintiff is unable to drive until he is seizure-free for six months, and plaintiff does not live on a bus line so he is unable to take the bus to work.  (Id.).  Dr. Myers stated that plaintiff has some trouble with cognition, and has difficulty keeping focused and doing a job when he is not supervised.  (Id.).  Dr. Myers stated that, not only would plaintiff have difficulty getting to work, but it would be difficult for him to find employment due to some of his cognitive impairment.  (Id.).  Dr. Myers indicated that he would continue plaintiff's current dosages of medications because increasing them in the past caused plaintiff to be too lethargic.  (Id.).  Dr. Myers stated that, because plaintiff's seizures occur only at night, he is "at least functioning adequately during the daytime."  (Id.).

In a Case Analysis dated September 15, 2009, state agency physician Paul Spence, M.D., stated that plaintiff's allegations were credible and supported by medical sources.  (Tr. 273).  Dr. Spence expressed the opinion that plaintiff met Listing 11.02A.  (Id.).

In a Case Analysis dated October 5, 2009, state agency physician Maria M. Legarda, M.D., expressed the opinion that plaintiff's nocturnal seizure disorder did not meet Listing

11.02B, and was nonsevere.  (Tr. 277).  Dr. Legarda recommended additional development for
mental issues.  (Id.).

      Plaintiff was admitted at St. Anthony's Medical Center on October 27, 2009, after having
a seizure at a McDonald's restaurant.  (Tr. 315).  Plaintiff reported that he had recently stopped
all of his medications because he was unable to afford them.  (Id.).  Plaintiff was moved to the
neurological intensive care unit for a period of time due to continued seizures.  (Id.).  Plaintiff had
intermittent confusion, which was thought to be due to one of the medications he was on.  (Id.).
Dr. Muchnick noted that plaintiff had a long history of mental status changes in cognition effects
possibly due to medication or due to the brain surgery done for the seizure disorder.  (Tr. 316).
Plaintiff underwent an EEG on October 29, 2009, which was "severely abnormal," and consistent
with complex partial seizures[8] with secondary generalization.[9]  (Tr. 326).  It was noted that
plaintiff probably has a right frontal temporal focus.  (Tr. 327).  Plaintiff was continued on
multiple seizure medications with no new seizures and slowly became more oriented.  (Tr. 315).
Plaintiff underwent an EEG on November 2, 2009, which was abnormal due to seizure discharges
seen, primarily in the right temporal area frontally, suggestive of a focal[10] or partial seizure type of

_____

      [8]A seizure with impairment of consciousness, occurring in a patient with focal epilepsy.
Stedman's at 1744.

      [9]Complex partial seizures with secondary generalization begin as complex partial seizures
but then spread, or generalize, to the rest of the brain and look like generalized tonic-clonic
seizures.  Generalized tonic-clonic seizures are characterized by the sudden onset of tonic
contraction of the muscles often associated with a cry or moan, and frequently resulting in a fall to
the ground.  The tonic phase of the seizure gradually give way to clonic convulsive movements
occurring bilaterally before slowing and eventually stopping, followed by a variable period of
unconsciousness and gradual recovery.  See Stedman's at 1744.

      [10]Focal epilepsy is characterized by focal seizures or secondarily generalized tonic-clonic
seizures.  Seizure symptoms are often related to the brain region where the seizure begins focally.

disorder. (Tr. 325). It was noted that there had been improvement compared to plaintiff's previous EEG. (Id.). By November 5, 2009, Dr. Muchnick noted that plaintiff had reached baseline and would be discharged. (Id.). Dr. Muchnick diagnosed plaintiff with seizure disorder due to noncompliance of medication. (Id.). Dr. Muchnick adjusted plaintiff's medications to try to make them more affordable, and indicated that he would try to get plaintiff free medications due to his inability to pay. (Id.).

On November 18, 2009, plaintiff presented to Lloyd Irwin Moore, Ph.D. for a psychological evaluation at the request of the state agency. (Tr. 281-85). Plaintiff reported that he was terminated from his position at St. Anthony's Hospital after twenty-three years because his supervisor told him his "attitude was changing." (Tr. 282). Plaintiff cannot drive and his activities are primarily consumed by taking care of his apartment and walking. (Id.). Plaintiff reported that he attended church but was not involved in any church activities or any other social activities. (Id.). Upon mental status examination, plaintiff was polite, maintained good eye contact, cooperative, calm, his affect was slightly blunted, and his mood appeared to be dysthymic although he denied dysthymia. (Tr. 283). Plaintiff's speech was normal for rate and volume, but at time plaintiff's response was somewhat extensive in terms of latency between questions asked. (Id.). Plaintiff's memory appeared to be intact, and his general fund of knowledge was sporadic. (Id.). Plaintiff was able to do simple calculations very well, his proverb interpretation was concrete, and his judgment was good. (Id.). Dr. Moore administered the Weschsler Adult Intelligence Scale 3rd Edition (WAIS-III), which revealed a verbal IQ score of 81, performance

---

Stedman's at 655.

IQ score of 72, and Full Scale IQ score of 75.[11]  (Id.).  Plaintiff's scores were found to be reliable

when taking into account his history of epilepsy.  (Id.).  Dr. Moore diagnosed plaintiff with mood

disorder NOS, borderline intellectual functioning, and a GAF score of 62.[12]  (Tr. 284).  Dr.

Moore stated that plaintiff has a life-long history of epilepsy and has had some changes recently

which apparently have affected his cognitive abilities.  (Id.).  With regard to plaintiff's functional

limitations, Dr. Moore stated that plaintiff has mild impairment in his ability to perform his

activities of daily living; mild impairment in his social functioning, noting that plaintiff interacts

with people rather well yet he does not form close relationships; and moderate limitations in his

concentration, persistence and pace, noting that plaintiff has difficulties with concentration,

persistence and pace due to a combination of mood and his chronic history of epilepsy.  (Id.).


James Spence, Ph.D., a state agency psychologist, completed a Psychiatric Review

Technique on December 14, 2009, in which he expressed the opinion that plaintiff had mild

limitations in his activities of daily living; moderate limitations in his ability to maintain social

functioning; and moderate limitations in his ability to maintain concentration, persistence, or pace.

(Tr. 295).  Dr. Spence also completed a Mental Residual Functional Capacity Assessment, in

which he expressed the opinion that plaintiff was moderately limited in his ability to understand

---

[11]Borderline intellectual functioning is defined as an IQ in the 71-84 range, while mental
retardation is defined as an IQ of 70 or below.  See Diagnostic and Statistical Manual of Mental
Disorders (DSM-IV), 684 (4th Ed. 1994).

[12]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and
mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships."  DSM-IV at 32.

and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; accept instructions and respond appropriately to criticism from supervisors. (Tr. 298-99). Dr. Spence stated that plaintiff is capable of completing simple, repetitive tasks on a sustained basis. (Tr. 300).

On February 12, 2010, Dr. Myers completed a Medical Source Statement-Seizures, in which he identified plaintiff's diagnosis as seizure disorder-onset around age five. (Tr. 307). Dr. Myers indicated that plaintiff suffers from epilepsy with major motor seizures, either grand-mal or psychomotor, and that these major motor seizures occur more frequently than once a month in spite of at least three months of prescribed treatment during the past year. (Id.). Dr. Myers noted that plaintiff has daytime episodes with loss of consciousness and convulsive seizures, and nocturnal episodes manifesting residuals which interfere significantly with activity during the day. (Tr. 308). Dr. Myers stated that plaintiff has some cognitive impairment. (Id.). Dr. Myers indicated that plaintiff also suffers from minor motor seizures, either petit mal, psychomotor, or focal, which are occasional and occur once weekly or less. (Id.). Dr. Myers stated that plaintiff at times has minor motor seizures with alteration of awareness or loss of consciousness. (Id.). Dr. Myers indicated that the limitations he assessed lasted twelve continuous months, or can be expected to last twelve continuous months at the assessed severity. (Id.).

Dr. Myers also completed a Mental Medical Source Statement on February 12, 2010, in which he expressed the opinion that plaintiff had marked limitation in his ability to cope with normal stress; maintain reliability; relate to family, peers, or caregivers; interact with strangers or the general public; and perform at a consistent pace without an unreasonable number and length of breaks. (Tr. 309-10). Dr. Myers found that plaintiff had moderate limitation in his ability to

- 15 -

function independently; behave in an emotionally stable manner; adhere to basic standards of neatness and cleanliness; maintain socially acceptable behavior; make simple and rational decisions; sustain an ordinary routine without special supervision; and respond to changes in work setting. (Id.). Dr. Myers found that plaintiff could apply commonsense understanding to carry out simple one-or-two-step instructions a total of four hours a day; interact appropriately with coworkers a total of four hours a day; interact appropriately with supervisors a total of zero to two hours a day; and interact appropriately with the general public a total of zero to two hours a day. (Tr. 311). Dr. Myers indicated that plaintiff would miss work, and be late to work or need to leave work early three times a month or more due to psychologically-based symptoms. (Id.). Dr. Myers stated that plaintiff has a seizure disorder, and that despite four anti-seizure medications at high dosages plaintiff has continued with around two seizures monthly. (Tr. 312). Dr. Myers stated that the drugs make it difficult for plaintiff to continue working and with the seizures he cannot drive to work. (Id.).

On June 28, 2010, Dr. Myers stated "[u]nfortunately, despite numerous medications, Jim is continuing to have seizures." (Tr. 328). Dr. Myers indicated that plaintiff's seizures mainly occur when he is sleeping but he has some seizures during the daytime as well. (Id.). Dr. Myers noted that plaintiff was sitting in a chair when he had a seizure and fell out of the chair. (Id.). Dr. Myers indicated that plaintiff did not remember biting his tongue or having any incontinence, but he may have had some clonic movements with the blackout. (Id.). Dr. Myers noted that plaintiff's sister, who was present during the examination, has seen plaintiff previously have seizures and observed extremity movement. (Id.). Dr. Myers increased plaintiff's Zonegran. (Id.). Dr. Myers noted that plaintiff was now on Medicaid and that arrangements had been made

- 16 -

for plaintiff to receive his medications at a reasonable cost.  (Id.).

## C.     Evidence Submitted to the Appeals Council

On June 14, 2011, Dr. Myers completed a Medical Report Including Physician's Certification/Disability Evaluation for the Missouri Department of Social Services Family Support Division.  (Tr. 339-40).  Dr. Myers stated that plaintiff has uncontrolled seizures, and that he is unable to work or drive.  (Tr. 339).  Dr. Myers indicated that he had last seen plaintiff June 23, 2010.  (Id.).  Dr. Myers indicated that plaintiff's primary diagnosis was uncontrolled generalized seizures, and that his secondary diagnosis was cognitive impairment.  (Tr. 340).  Dr. Myers stated that plaintiff has over six episodes monthly with medication.  (Id.). Dr. Myers expressed the opinion that plaintiff has a mental and/or physical disability which prevents him for engaging in employment.  (Id.).

Dr. Myers completed a second Medical Source Statement-Seizures on June 14, 2011, in which he identified plaintiff's diagnosis as generalized seizure disorder.  (Tr. 341).  Dr. Myers provided the same information as his previous statement, except he indicated that plaintiff's minor motor seizures occurred more frequently than once weekly.  (Tr. 342).  Dr. Myers also indicated that plaintiff had minor motor seizures with transient postictal manifestations of unconventional behavior or significant interference with activity during the day.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since February 28, 2008, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.  The claimant has the following severe impairments: borderline intellectual functioning and depression (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of unskilled work at all exertional levels but with the following nonexertional limitations: the claimant is limited to jobs that involve simple, repetitive tasks.

6.  The claimant is capable of performing past relevant work as a central supply clerk.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2008, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 19-23).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on June 22, 2009, the claimant is not disabled under sections 216(I) and  223(d) of the Social Security Act.

(Tr. 23).

## Discussion

### A.  Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

- 19 -

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

- 20 -

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms,

findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1),

416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or absent."

20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree

of functional loss resulting from the impairments in four areas deemed essential to work:

activities of daily living, social functioning, concentration, and persistence or pace.  See

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform work-

related activities.  See id.  Next, the Commissioner must determine the severity of the impairment

based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is

- 21 -

severe, the Commissioner must determine if it meets or equals a listed mental disorder.  <u>See</u>

20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  <u>See</u> <u>id.</u>  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.**     **<u>Plaintiff's Claims</u>**

        Plaintiff first argues that the ALJ erred in finding that plaintiff could perform past relevant

work.  Plaintiff next argues that the ALJ erred in evaluating the medical opinion evidence.

Plaintiff also contends that the ALJ erred in omitting plaintiff's seizure disorder as a severe

impairment at step two.  Plaintiff finally argues that the ALJ erred in determining plaintiff's RFC.

The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's step two

determination.

**1.**     **Step Two Determination**

        The ALJ found that plaintiff has the following severe impairments: borderline intellectual

functioning and depression.  (Tr. 19).  Plaintiff contends that the ALJ erred in omitting plaintiff's

seizure disorder as a severe impairment at step two.

        At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from

a severe impairment.  <u>Kirby v. Astrue</u>, 500 F.3d 705, 707 (8th Cir. 2007).  The claimant bears the

burden of proving her impairment or combination of impairments is severe, but the burden is not a

heavy one, and any doubt concerning whether the showing has been made must be resolved in

favor of the claimant. Id. "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ." Kirby, 500 F.3d at 707. An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. Kirby, 500 F.3d at 707; 20 C.F.R. § 404.1521(a).

In this case, the evidence in the record strongly indicates that plaintiff's seizure disorder amounts to more than a minimal limitation on his ability to perform basic work activities. Plaintiff had been experiencing seizures since the age of five and he underwent seizure surgery of the brain around 2000 due to the severity of his seizures. (Tr. 272). Treatment records dated February 2007 through June 2010 from plaintiff's treating neurologist, Dr. Myers, reveal that plaintiff experienced seizures despite taking four different medications for a seizure disorder. (Tr. 266, 267, 268, 270, 328). Plaintiff underwent an EEG in April 2008, which was abnormal and consistent with a right-cerebral lesion with a seizure-type of focus. (Tr. 240). In July 2009, Dr. Myers stated that plaintiff has a "very difficult seizures disorder for which he is on numerous medications." (Tr. 272). Dr. Myers stated that, despite all of plaintiff's medications, he was still having at least one seizure monthly. (Id.). Dr. Myers also indicated that plaintiff has some difficulty with cognition. (Id.). Dr. Myers stated that plaintiff has difficulty keeping focused and doing a job when is not supervised. (Id.). Dr. Myers indicated that he would not increase plaintiff's seizure medications, as it would cause plaintiff to be too lethargic. (Id.). Plaintiff underwent an EEG in November 2009, which was abnormal and suggestive of a focal or partial seizure type of disorder. (Tr. 325). In June 2010, Dr. Myers stated, "[u]nfortunately, despite numerous medications, Jim is continuing to have seizures." (Tr. 328). Dr. Myers indicated that plaintiff's seizures mainly occur when he is sleeping, but he has some seizures during the day as

well.  (Id.).  Dr. Myers noted that plaintiff had fallen out of a chair while having a seizure, and that plaintiff's sister had seen plaintiff have seizures and observed extremity movement.  (Id.).

At the administrative hearing, plaintiff testified that, after experiencing a seizure during the day, he is especially tired, and has to sleep for two hours or longer.  (Tr. 35).  Plaintiff stated that he experiences difficulty concentrating after having a seizure.  (Id.).  Plaintiff testified that he experiences approximately one daytime seizure a week.  (Tr. 45).  Plaintiff testified that, when he experiences a nighttime seizure, he feels tired, groggy, and slow for approximately two hours after waking in the morning.  (Tr. 43).

Despite the significant evidence in the record regarding plaintiff's seizure disorder, the ALJ did not discuss the severity of plaintiff's seizure disorder at step two of the sequential analysis, and did not include his seizure disorder as a severe impairment.  (Tr. 19).  The ALJ subsequently indicated that plaintiff typically experiences seizures infrequently when compliant with his medication.  (Tr. 21).  The ALJ stated that it is unusual for plaintiff to have a daytime seizure.  (Id.).  The ALJ stated that there is no "persuasive objective evidence" that plaintiff's seizures interfere with plaintiff's ability to engage in daytime work activities.  (Id.).

The undersigned finds that the ALJ erred in failing to properly evaluate the severity of plaintiff's seizure disorder at step two.  Despite the ALJ's finding to the contrary, the medical evidence reveals that plaintiff suffers from seizures during the day as well as during the night, even when compliant with his multiple medications, and that plaintiff experiences cognitive difficulties as a result of the seizures.  (Tr. 328, 272).  Plaintiff testified that he would be required to miss at least two hours of work immediately after experiencing a daytime seizure due to the severe fatigue it causes.  (Tr. 44).  Even if partially discounted, the evidence of record reveals that

plaintiff's seizure disorder would have more than a minimal effect on his ability to work, and that his seizure disorder is severe.  See Kirby, 500 F.3d at 707.

**2.      Medical Opinion Evidence**

Plaintiff contends that the ALJ erred in discounting the findings of Dr. Myers, and relying on the opinion of a state agency physician in finding plaintiff's seizure disorder was nonsevere.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians.  Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).  The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole.  Id.  Normally, the opinion of the treating physician is entitled to substantial weight.  Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007).  The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician.  20 C.F.R. § 404.1527(d)(1).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data.  Casey, 503 F.3d at 691.  The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent.  Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000).  In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations.  Casey, 503 F.3d at 692.

Dr. Myers completed a Medical Source Statement-Seizures on February 12, 2010, in which he indicated that plaintiff suffers from epilepsy with major motor seizures, either grand-mal or psychomotor, and that these major motor seizures occur more frequently than once a month. (Tr. 307).  Dr. Myers noted that plaintiff experiences daytime episodes with loss of consciousness and convulsive seizures, and nocturnal episodes manifesting residuals which interfere significantly with activity during the day.  (Tr. 308).  Dr. Myers stated that plaintiff has some cognitive impairment.  (Id.).  Dr. Myers indicated that plaintiff also suffers from minor motor seizures, either petit mal, psychomotor, or focal, which are occasional and occur once weekly or less. (Id.).  Dr. Myers also completed a Mental Medical Source Statement, in which he expressed the opinion that plaintiff had marked limitation in his ability to cope with normal stress; maintain reliability; relate to family, peers, or caregivers; interact with strangers or the general public; and perform at a consistent pace without an unreasonable number and length of breaks. (Tr. 309-10). Dr. Myers also found that plaintiff had moderate limitations in many areas.  (Id.).  Dr. Myers completed a second Medical Source Statement-Seizures on June 14, 2011, which plaintiff submitted to the Appeals Council.  In this statement, Dr. Myers provided the same opinions as his previous statement, except he indicated that plaintiff's minor motor seizures occurred more frequently than once weekly.  (Tr. 342).  Dr. Myers also indicated that plaintiff had minor motor seizures with transient postictal manifestations of unconventional behavior or significant interference with activity during the day.  (Id.).

The ALJ acknowledged Dr. Myers February 2010 statement, but stated that Dr. Myers' assessment was not consistent with his treatment notes and, therefore, cannot be given significant

weight.  (Tr. 21).  The ALJ indicated that he was instead assigning significant weight to the opinion of non-examining state agency physician Dr. Legarda.  (Tr. 22).

In a Case Analysis dated October 5, 2009, state agency physician Dr. Legarda, expressed the opinion that plaintiff's nocturnal seizure disorder was nonsevere.  (Tr. 277-79).  Dr. Legarda recommended additional development for mental issues.  (Id.).  As support for her finding, Dr. Legarda summarized Dr. Myers records, and noted that plaintiff's seizures were under control with medication and occurred only during the day.  (Tr. 279).

The undersigned finds that the ALJ erred in discrediting the opinions of Dr. Myers and relying on the opinion of a non-examining state agency physician.  At the time of the hearing, Dr. Myers had been plaintiff's treating neurologist for approximately ten years.  (Tr. 133, 157).  As such, Dr. Myers' opinions were entitled to substantial weight, provided they were supported by the record.  Dr. Myers' treatment notes reveal that plaintiff continued to experience seizures despite taking high dosages of four different medications.  In June 2010, plaintiff was experiencing daytime seizures as well as nighttime seizures despite his medications.  (Tr. 328).  Objective testing has confirmed the presence of seizure activity on multiple occasions.  (Tr. 240, 326, 325).  Thus, the medical record is consistent with Dr. Myers' opinions.

Dr. Legarda's opinion was based solely on a review of the medical record on October 5, 2009.  Under Singh, the opinion of a non-examining physician "does not generally constitute substantial evidence."  Singh, 222 F.3d at 452.  Dr. Legarda based her opinion on the facts that plaintiff only experienced seizures at night, and that plaintiff's seizures were controlled with medication.  Dr. Myers' later treatment records reveal, however, that plaintiff continued to experience seizures despite being compliant with medication, and that plaintiff experienced seizures during the day.  Thus, Dr. Legarda's opinion is not supported by the medical evidence.

- 27 -

After erroneously finding plaintiff's seizure disorder to be nonsevere, the ALJ formulated an RFC that did not include limitations arising from plaintiff's seizure disorder, and then determined that plaintiff could return to past relevant work as a central supply clerk and was not, therefore disabled.  (Tr. 23).  The ALJ's determination is not supported by substantial evidence for the reasons discussed above.

## Conclusion

In sum, the ALJ erred in discrediting the opinions of Dr. Myers and relying on the opinion of Dr. Legarda in determining plaintiff's seizure disorder was nonsevere.  As a result, the ALJ's RFC determination, and step four determination are not supported by substantial evidence.  For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to consider plaintiff's seizure disorder as a severe impairment, accord the proper weight to the opinions of Dr. Myers, and proceed with the sequential analysis.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this 27th  day of March, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

- 28 -